Amanda Metcalf  SB 57177
Nyanza Shaw  SB 191423
Law Offices of A. Metcalf
29 Marin Bay Park Court
San Rafael, CA. 94901
Telephone: 415-454-0945
Facsimile: 415-454-9145

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Oakland Division

| | |
|---|---|
| AMANDA METCALF<br>       Plaintiff, | CASE NO.  03-01250 EMC |
| vs. | **COMPLAINT UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT** |
| DEATH ROW RECORDS, INC., THE ROW RECORDS, MARION "SUGE" KNIGHT, REGGIE WRIGHT, | |
|        Defendants.<br>_____/ | JURY TRIAL DEMANDED |

Plaintiff, **Amanda Metcalf**, for her complaint alleges as follows:

**PARTIES**

1. Plaintiff, **Amanda Metcalf**, is an attorney who resides in and has

practiced law in California for nearly thirty years. Plaintiff has served as a California Deputy Attorney General, an Assistant United States Attorney for the Northern District of California, as been associated in the practice of civil litigation with large, highly reputable bay-area law firms, has served as a member of the faculty of Hastings College of the Law and as Judge, Pro Tem of the State Court in Marin County, California.

2. Defendant **Death Row Records, Inc.,** is a corporation, engaged the music and entertainment industry, doing business throughout the State of California, the United States and most foreign countries. Defendant **The Row Records,** is a company, type unknown, which plaintiff believes is either a d.b.a. of Death Row Records, Inc., or the successor to Death Row Records Inc. In this complaint Death Row Records, Inc., and The Row Records, are referred to as "**Death Row**".

3. Defendant **Marion "Suge" Knight,** is an individual, a resident of the State of California and is the owner and CEO of Death Row Records, Inc., and The Row Records.

4. Defendant **Reggie Wright,** is an individual, a resident of the State of California, and was the titular CEO of Death Row during the period of "Suge" Knight's incarceration by the California Department of Corrections (1996-2001), during which period the incidents and activities complained of herein

occurred.

## JURISDICTION AND VENUE

5. This court's jurisdiction is based upon 18 USC Section 1964(c).

6. Venue is proper in this judicial district pursuant to 28 USC Section 1391(b), because a transaction integral to the illegal activities alleged herein was entered into in this district and because the defendants are engaged in doing business in this district.

## NATURE OF THE ACTION

7. This action arises out of a scheme to defraud plaintiff of in excess of $1.5 million dollars through false representations, threats, extortion and conspiracy engaged in by defendants Death Row, Knight, and Wright, and Dick Griffey and Companies owned and or controlled by Dick Griffey.

## FACTUAL BASIS FOR CLAIMS

8. On December 30, 1996, plaintiff entered into a agreement, which was modified in February, 1997, whereby she was retained by entertainment and investment mogul, Dick Griffey to provide legal services. Black Enterprise Magazine lists Griffey and his companies (Sounds of Los Angeles (Solar) Records, the Hines Company, the African Development Public Investment Corporation (ADPIC), a company engaged in oil and gold commodities trading,

as one of the nation's 10 biggest black-owned industrial and service companies. with holdings exceeding $86 million.

9. Plaintiff represented Griffey, members of his family and the Griffey companies in litigation against Death Row Records and Knight, filed in 1996 in Los Angeles County Superior Court, <u>Dick Griffey v. Andre Young, Marion "Suge" Knight, Death Row Records, et al.,</u> Case No. BC 142104. In that action Griffey claimed Death Row and Knight had defrauded him of millions of dollars by the illegal conversion of artists contracts, money and other assets from the Death Row partnership formed by Griffey, Knight, Andre Young (Dr. Dre) and Tracy Curry (DOC).

### Death Row's and Knights Notorious History

10. Death Row is considered by many, if not most, people in the entertainment industry to be the most notorious record label in the history of music. This is due primarily to the reputation of Death Row's CEO and co-founder, Marion "Suge" Knight. The label which has generated hundreds of millions of dollars since its inception in 1991, was home to top earning rap music stars such as Dr. Dre, Snoop Doggy Dog, Tupac Shakur and Eminem.

11. The exploits of Knight and Death Row are reported in numerous newspaper and magazine articles and a recent best seller, "Have Gun Will Travel...The Rise and Fall of Death Row Records." It is reported that when

Knight was starting Death Row Records he vowed that his label would be the Motown of the 90's. In the early 90's when recording artist Dr. Dre, DOC, and Miche'lle, left Jerry Heller's successful Ruthless Records label for Death Row, Heller claimed the three artists who were under contract with his company were freed from their contractual obligations only because the Ruthless staff feared for their lives. The owner of the Ruthless label claimed that Knight used to taunt their business offices with guns and at one point threatened the owner of Ruthless with pipes and bats if he did not release the three artists.

    12. With the release the album "The Chronic" in 1992, Death Row made history by selling over 10 million copies of the album. During the recording of "The Chronic", two brothers, (the Stanley brothers) claimed Knight beat them with a pistol and ordered them to remove their clothes because one of the brothers used a telephone (in the Death Row/Griffey) recording studio without Knight's permission. These allegations landed Knight in court where he received seven years probation.

    13. Knight was forming a reputation as a ruthless thug. In 1993, Death Row artists and an entourage traveled to Miami, Florida to attend the "Jack the Rapper" convention at which Knight was reportedly seen walking down Miami streets carrying a loaded weapon in clear view. At another convention held in New Orleans, Knight was charged with starting a riot in a hotel lobby in which

seven police officers were injured.

14.  Knight has publicly declared his affiliation with the Mob Piru Bloods street gang by always wearing bright red clothing, wearing a ring that says "MOB" and by naming his club in Las Vegas, "Club 662", which spells out MOB on a telephone keypad.

15.  After the Mike Tyson vs. Bruce Selden prizefight on September 7, 1996, Knight, rapper Tupac Shakur (whom Knight had earlier bailed out of Rikers Island Prison) and a Death Row entourage engaged in an assault on Orlando Anderson, a member of the Southside Crips gang of Compton, at the MGM Grand Hotel in Las Vegas.  Later in the night, Tupac Shakur was shot and died six days later.

16.  The documentary film "Biggie and Tupac" by filmmaker Nick Bloomfield that investigates the murders of rap stars Tupac Shakur and Biggie Smalls, was released in September, 2002.  San Francisco Examiner columnist Jeffrey Anderson, in his September 18, 2002 review of the documentary states:

> *"In "Biggie and Tupac" fearless documentary filmmaker Nick Bloomfield reveals almost haphazardly a conspiracy originating with Tupac's record label, Death Row, and its godfather-like ruler, "Suge" Knight...The back story is that Death Row owed Tupac $10 million.  Tupac threatened to quit and have the label audited, but he was killed before that happened.  Many believe that Knight was linked to the crime, but before any connection could be established, Biggie was killed, providing a distraction that some observers saw as a smokescreen"...*

> *"Bloomfield discovers that Death Row hired off duty Los Angeles cops for day-to-day security; in return, they played dumb when the label's artists got mixed up in any wrongdoings-from drugs to murder."...*
>
> *Bloomfield also scores an interview with Knight who was serving his final months in prison on charges unrelated to the murders. While Knight evades the question of what happened to Biggie and Tupac, he makes veiled threats to rapper Snoop Dogg, who also works for Death Row and was apparently having money troubles similar to Tupac's"...*
>
> *"In the end...its difficult to refute the notion that Knight had both rappers killed....Tupac to protect his business and Biggie to cover-up the first murder."*

17. As a result of charges brought against Knight stemming from the September 7, 1996 assault at the MGM Grand Hotel, Knight was sentenced by Superior Court Judge Czuleger to nine years in prison for violating his 1992 probation. In sentencing Knight the Judge stated that Knight was "a threat to the public."

## The Litigation against Knight and Death Row

18. It was during his incarceration in 1997, that plaintiff first encountered Knight. In representing Dick Griffey, in his action against Knight and Death Row, plaintiff secured an order from the Los Angeles Superior Court for Knight's deposition while he was being detained at the Federal Detention Center in Los Angeles, in connection with federal criminal charges. Even during his imprisonment, Knight continued to direct and control the operations of Death Row. After extensive pre-trial proceedings which culminated in the trial court's

Amanda Metcalf v. Death Row Records, et al, Complaint for RICO Violations        7

grant of Griffey's dispositive Motion for Summary Judgment, the court ordered the parties to convene a settlement conference at the state prison in San Luis Obispo, California, where Knight was then incarcerated.

19. When the settlement conference convened in San Luis Obispo on December 1, 1997, counsel for both Griffey and Knight/Death Row were excluded from the private negotiations between the parties, at Knight's request. At the conclusion of their negotiation, Griffey announced that he and Knight had reached agreement whereby Death Row would pay Griffey the sum of $4 million in settlement of Griffey's claims. Griffey later stated to plaintiff that although he and Knight had agreed that a judgment would be entered for $4 million, the parties had agreed that (Griffey) would secretly kick-back $1million to Knight.

20. The Stipulated Judgment signed by the parties and their attorneys on December 1, 1998, directed that Death Row and Knight pay $4 million to "Griffey and his attorney Amanda Metcalf, on or before January 31, 1998." The judgment was not timely paid and on February 2, 1998, a formal Judgment was entered by the court. On February 3,1998, plaintiff filed a Judgment Lien with the court, giving notice that she was entitled to receive one-third of the judgment amount pursuant to the judgment and her contract with Griffey.

### Knight, Death Row and Griffey Strike a New Deal

21. On January 28, 1998 plaintiff accompanied Griffey on a visit to Knight at the California Men's Penal Colony at San Luis Obispo. Both Knight and Griffey rquested that plaintiff excuse herself from their discussion. At the conclusion of the visit, Griffey informed plaintiff that he had and Knight had agreed to amend the settlement and that the new agreement would be "more profitable for us in the long run, because Knight had agreed to let him (Griffey) release one or two of the late Tupac Shakur's recordings which should gross $20-$30 million."

22. When Death Row and Knight failed to pay the judgment, plaintiff initiated enforcement proceedings against them. Thereafter, Death Row made some partial payments on the judgment, each time by way of cashier's check made payable to "Griffey and his attorney Amanda Metcalf."

23. Griffey objected to plaintiff's efforts to enforce the judgment and though he thereafter denied ever having made any side deals with Knight, he directed plaintiff to cease efforts to enforce the judgment by levying against valuable real and personal property owned by Death Row and Knight.

24. In early 1998, at Griffey's request, plaintiff filed and prosecuted a lawsuit representing Griffey against entertainer Andre Young (Dr. Dre) wherein Griffey sought several millions in unpaid royalties and fees claimed to be due him from Young. During 1998 time Griffey became more and more secretive

about his relationship with Knight and Death Row and continued to resist and disapprove plaintiffs plans to enforce the judgment.

25. During 1998 and 1999 Griffey and, Knight and Death Row, continued to represent to plaintiff that Knight and Death Row were experiencing financial difficulties that would not allow Death Row to keep the several different commitments it made to make installment payments on the balance owed on the judgment. In January, 1999, plaintiff learned that a payment of $150,000 was supposed to be received from Death Row. Throughout the month of January plaintiff was assured by Knight and Death Row and by Griffey, Griffey's attorney Virgil Roberts and Griffey's daughter Regina Hughes, who was a corporate officer and handled managed the accounts for the Griffey organization (the Hines Company and ADPIC) that the payment had not been made.

26. In March, 1999 plaintiff learned that a payment of $450,000 was to be made by Death Row. During the period March 1, thru March 23, 1999, in furtherance of the conspiracy devised by defendants, and each of them, Griffey, Regina Hughes and Death Row continued to represent to plaintiff that no payments at all had been made by or received from Death Row.

27. On or about March 23, 1999, plaintiff spoke with David Kenner, the attorney for Death Row and Knight. Kenner informed plaintiff that not only had

Death Row delivered a check for $450,000 to Griffey on or about March 22, 1999, but that Death Row had also delivered to Griffey a check for $150,000 at the end of January, 1999.  Kenner further informed plaintiff that both checks were cashier's checks made payable to "Dick Griffey **and** his attorney Amanda Metcalf."  Plaintiff also learned from Kenner that the $150,000 check had been cashed on or about February 1, 1999 as had the $450,000 check, both by Griffey's bank Merrill Lynch.

28.  On or about July 1, 2002 during pre-trial proceedings in a lawsuit filed by plaintiff against Griffey, Merrill Lynch and others in Los Angeles County Superior Court, plaintiff learned that Griffey had gotten Merrill Lynch to negotiate the $150,000 check without plaintiff's endorsement and that Griffey had forged plaintiff's signature on the $450,000 check. Both checks were negotiated by use of wire transmissions between banks as provided for in the Uniform Commercial Code.

**Conspiracy, Threats, Coercion and Extortion Against Plaintiff**

29.  Knight, Death Row, Wright and Griffey devised a scheme whereby they agreed to deprive plaintiff of monies owed to her pursuant to the judgment entered against Knight and Death Row.   Pursuant to their scheme and in furtherance of their conspiracy, in or about mid-January, 2000 Griffey drafted a letter which he mailed and faxed to plaintiff advising that he no longer wished to

pursue collection of any monies owed by Death Row and Knight pursuant to the judgment. In the letter, Griffey demanded that plaintiff file a Satisfaction of Judgment releasing both his claims and plaintiff's claims for money owed by Death Row and Knight. When plaintiff refused to comply with Griffey's demands, Griffey, himself filed a Satisfaction with the Los Angeles County Superior Court which falsely indicated that both he and plaintiff were abandoning their claims against Knight and Death Row. Plaintiff contacted the court and caused the Satisfaction to be set aside because of the false representations contained therein.

30. Thereafter, defendants and the other Conspirators scheduled a meeting with plaintiff at which they planned to employ threats, coercion and extortion to force plaintiff to abandon her claims for money against the defendants and Griffey. On or about February 9, 2000, in the early afternoon at a restaurant in an office building at 350 South Figueroa in Los Angeles, Griffey and Reggie Wright, the person appointed by Knight to be the titular CEO of Death Row during Knight's incarceration in state prison. Knight and Death Row and Griffey had been pressuring plaintiff to dismiss her judgment against them, alleging that they had no money with which to pay. Although plaintiff's judgment lien had not been paid and interest was mounting on the large unpaid balance, Griffey had threatened to fire plaintiff if she did not file a satisfaction of

judgment dismissing her claims against him, Knight and Death Row.

31. At the February 9, meeting Wright, stated that he was acting on directions from Knight and on behalf of both Knight and Death Row. Griffey and Wright said that if plaintiff field a satisfaction they would see to it that plaintiff was paid what was owed her, but that if failed to file the satisfaction she would never be paid. Griffey had always touted the fact that he had so concealed his assets that no judgment had ever been or could be enforced against him. Wright threatened that if plaintiff failed to execute a satisfaction of judgment Knight and Death Row would wipe-out their debt by filing bankruptcy. Wright and Griffey also stated that it had been decided that in addition, if plaintiff refused to file execute a Satisfaction of Judgment, Griffey would immediately dismiss plaintiff as his attorney of record in Griffey's case pending against Andre Young, which was scheduled for trial in a few days, and refuse to pay the fees plaintiff had earned in that case which, together with unpaid expenses were approximately $200,000. At the end of the meeting plaintiff agreed to execute the Satisfaction of Judgment.

32. As a result of the conspiracy and scheme devised and perpetrated by Knight, Death Row, Wright and Griffey, through and by their control of the Death Row enterprise and the Griffey organization enterprise, defendants and each of them, engaged in a pattern of racketeering activities that defrauded

plaintiff of more than $1.5 million.

## COUNT ONE - RICO VIOLATION

33. Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 32 as if fully set forth herein.

34. At all relevant times, Plaintiff was a "person" within the meaning of RICO, 18 USC Section 1961(3) and 1964(c).

35. At all relevant times, Death Row Records, Inc., The Row Records, Marion "Suge" Knight and their officers, agents and employees, the other Conspirators, including but not limited to Reggie Wright, Dick Griffey, and the Griffey companies (Solar, the Hines Company and ADPIC), and their agents, officers and employees were persons within the meaning of RICO, 18 USC Section 1961(3) and 1962(b) and (c).

36. At all relevant times, Knight, Death Row Records Inc., The Row Records and their officers, agents and employees and the other Conspirators (Griffey and the Griffey companies, their officers, agents and employees) formed an association-in-fact for the common purpose of defrauding plaintiff as described in this complaint; namely depriving plaintiff and perhaps others of funds owed on a lawful debt and diverting and converting those funds to themselves for their own use, which included, but was not limited to investment or re-investment of said funds in Death Row and the Griffey companies. This

association-in-fact was an "enterprise" within the meaning of RICO, 18 USC, Section 1961(4).

37. At all relevant time, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 USC Section 1962(c).

38. At all relevant times, Knight, Death Row Records, Inc., The Row Records and the other Conspirators associated with this enterprise conducted and participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 USC Section 1961(5), in violation of RICO, 18 USC Section 1962(c).

39. Specifically, at all relevant times, Knight, Death Row Records, Inc., The Row Records and the other Conspirators engaged in "racketeering activity" within the meaning of RICO, 18 USC Section 1961(1) by engaging in the acts set forth above. The acts set forth above constitute a violation of one or more of the following statutes: 18 USC Section 201 (relating to bribery), 18 USC Section 1341 (relating to mail fraud), 18 USC Section 1343 (relating to wire fraud), 18 USC Section 1951 (relating to extortion), 18 USC Section 1344 (relating to financial institution fraud) and California Penal Statutes (relating to the use of threats, intimidation, coercion and extortion).

40. The acts of racketeering activity referred to in the previous paragraph

constituted a "pattern of racketeering activity" within the meaning of 18 USC Section 1961(5).  The acts alleged were related to each other by virtue of common participants, a common victim (plaintiff), a common method of transmission and the common purpose and common result of defrauding plaintiff of in excess of $1.5 million and enriching the Conspirators at plaintiff's expense while concealing the Conspirators' fraudulent activities.  The fraudulent scheme continued for over two years until March, 2002, and would threatened to continue longer but for the institution of legal action by plaintiff.

41.  As a result of Knight and Death Row and the other Conspirators' violations of 18 USC Section 1962(c), plaintiff lost in excess of $1.5 million.

42.  As a result of their misconduct, Knight, Death Row Records, Inc., and The Row Records, and each of them, are liable to plaintiff for her losses in an amount to be determined at trial.

43.  Pursuant to 18 USC Section 1964(c), plaintiff is entitled to recover threefold her damages plus costs and attorneys' fees from Knight, Death Row Records Inc., and The Row Records, and each of them.

### COUNT TWO - RICO CONSPIRACY

44.  Plaintiff re-alleges each of the allegations contained in paragraphs 1 through 43 as if fully set forth herein.

45. At all relevant times, plaintiff was a "person" within the meaning of RICO, 18 USC Sections 1961(3) and 1962(c).

46. At all relevant times Knight, Death Row and the other Conspirators were each a "person" within the meaning of RICO, 18 USC Sections 1961(3) and 1962(d).

47. At all relevant times, Knight, Death Row and the other Conspirators formed an association-in-fact for the purpose of defrauding plaintiff. This association-in-fact was an "enterprise" within the meaning of RICO, 18 USC Section 1961(4).

48. At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commence, within the meaning of RICO, 18 USC Section 1962(c).

49. As set forth in Count One, Knight, Death Row and the other Conspirators associated with this enterprise conducted and participated directly and indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 USC Section 1962(c).

50. At all relevant times, Knight, Death Row and the other Conspirators each were associated with the enterprise and agreed and conspired to violate 18 USC Section 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of

racketeering activity in violation of 18 USC Seciton 1962(d).

51. Knight and Death Row and the other Conspirators committed and caused to be committed a series of overt acts in furtherance of the Conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

52. As a result of Knight and Death Row and the other Conspirators' violations of 18 USC Section 1962(d), plaintiff lost in excess of $1.5 million.

53. As a result of the Conspiracy, Knight, Death Row Records, Inc., The Row Records and Wright are liable to plaintiff for her losses in an amount to be proved at trial.

54. Pursuant to RICO, 18 USC Section 1964(c0, plaintiff is entitled to recover threefold her damages plus costs and attorneys' fees from Knight, Death Row Records, Inc., The Row Records, Wright, and each of them.

WHEREFORE, Plaintiff prays for judgment in her favor:

(1) awarding plaintiff damages, including compensatory, treble, and punitive damages, as well as prejudgment and postjudgment interest, in an amount to be determined at trial;

(2) ordering defendants to provide proof of any monies they claim they paid to plaintiff in reduction of the Judgment (or plaintiff's portion thereof) plus the interest accrued thereon;

  (3) awarding plaintiff the costs, expenses, and attorney fees incurred in this litigation.

Dated: March 24, 2003      LAW OFFICES OF AMANDA METCALF

             By_____
              Amanda Metcalf, Attorney and Plaintiff